1
2
3
4
5
6
7
8            **UNITED STATES DISTRICT COURT**
9            **CENTRAL DISTRICT OF CALIFORNIA**
10
11   LAURA M. KEMP,                )   NO. ED CV 17-2112-E
                                   )
12                  Plaintiff,     )
                                   )
13          v.                     )   **MEMORANDUM OPINION**
                                   )
14   NANCY A. BERRYHILL, Deputy    )   **AND ORDER OF REMAND**
     Commissioner for Operations,  )
15   Performing duties and functions not )
     reserved to the Commissioner of )
16   Social Security,              )
                                   )
17                  Defendant.     )
     _____)
18
19
20        Pursuant to sentence four of 42 U.S.C. section 405(g), IT IS
21   HEREBY ORDERED that Plaintiff's and Defendant's motions for summary
22   judgment are denied, and this matter is remanded for further
23   administrative action consistent with this Opinion.
24
25                           **PROCEEDINGS**
26
27        Plaintiff filed a Complaint on October 13, 2017, seeking review
28   of the Commissioner's denial of disability benefits.  The parties

filed a consent to proceed before a United States Magistrate Judge on December 8, 2017.

Plaintiff filed a motion for summary judgment on April 23, 2018. Defendant filed a motion for summary judgment on June 15, 2018. The Court has taken both motions under submission without oral argument. See L.R. 7-15; "Order," filed October 24, 2017.

**BACKGROUND**

Plaintiff, a former "job coach," "mental health counselor" and social services "case manager," asserts disability since November 22, 2012, based primarily on alleged frontal lobe brain damage, seizures, stenosis of the cervical and lumbar spines, high blood pressure and fibromyalgia (Administrative Record ("A.R.") 46-48, 191-98, 218, 241).[1] An Administrative Law Judge ("ALJ") examined the record and heard testimony from Plaintiff and a vocational expert (A.R. 20-34, 41-74, 342-703).

The ALJ found Plaintiff has the following severe impairments: "cerebral vascular accident ("CVA"); seizure disorder; fibromyalgia; lumbar and cervical spine degenerative disc disease; status post thyroid removal; anxiety disorder; and depressive disorder" (A.R. 23). The ALJ also found, however, that Plaintiff retains the residual

---

[1]    After Plaintiff applied for benefits, Plaintiff suffered a stroke (in September of 2014), and was diagnosed with thyroid cancer and underwent a thyroidectomy (in April of 2015). See A.R. 465, 610-14.

functional capacity to perform light work limited to: (1) occasionally performing postural activities; (2) no climbing of ladders, ropes and scaffolds; (3) no working around heights and dangerous moving machinery; and (4) only simple repetitive tasks with occasional contact with supervisors, coworkers and the public (A.R. 25-26). The ALJ concluded that, with such capacity, Plaintiff could perform light work as a "mail sorter," "routing clerk" or "price marker," and therefore is not disabled (A.R. 33 (adopting vocational expert testimony at A.R. 69-70)). The Appeals Council denied review (A.R. 1-3).

In reaching his decision, the ALJ rejected the opinion of treating physician Dr. Edward Victoria that Plaintiff has limitations which would preclude work. See A.R. 29-30 (citing A.R. 700-03 (Dr. Victoria's "Physical Residual Functional Capacity Statement" form)). The ALJ also found Plaintiff's statements concerning the alleged severity of Plaintiff's symptoms not entirely credible (A.R. 26-31).

**STANDARD OF REVIEW**

Under 42 U.S.C. section 405(g), this Court reviews the Administration's decision to determine if: (1) the Administration's findings are supported by substantial evidence; and (2) the Administration used correct legal standards. See Carmickle v. Commissioner, 533 F.3d 1155, 1159 (9th Cir. 2008); Hoopai v. Astrue, 499 F.3d 1071, 1074 (9th Cir. 2007). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401

(1971) (citation and quotations omitted); see <u>Widmark v. Barnhart</u>, 454 F.3d 1063, 1067 (9th Cir. 2006).

> If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ. But the Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence. Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [administrative] conclusion.

<u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and quotations omitted).

**DISCUSSION**

Plaintiff contends, <u>inter alia</u>, that substantial evidence does not support the ALJ's residual functional capacity determination. As discussed below, the Court agrees.

**I.** **<u>Summary of the Medical Records</u>**

The record contains treatment notes predating the alleged disability period. <u>See</u> A.R. 349-57, 421-23. In March of 2010, Plaintiff consulted with neurologist Dr. Purnima Thakran for "convulsions," reporting a chronic rash, fatigue, dizziness, slurred speech, loss of balance, irregular heart beat, nausea, muscle pain and twitching, joint pains, neck pain, headache, weakness, memory trouble,

trouble concentrating and sleeping, depression, dry eyes, dry mouth and excessive urination (A.R. 421-22). Plaintiff reported a medical history of a traumatic brain injury in 1984, which she claimed was a precursor to severe personality changes and a prior inpatient psychiatric hospitalization for agitation and homicidal behavior (A.R. 421-22). Dr. Thakran reported an "unremarkable" general examination apart from observed "abnormal movements" and flat affect (A.R. 422-23). Dr. Thakran noted no abnormal findings on mental status examination (id.). Dr. Thakran diagnosed "generalized epilepsy syndrome versus non-epileptic events due to psychiatric history," ordered an EEG, prescribed Topamax, and instructed Plaintiff to take certain seizure precautions (i.e., no driving, climbing, swimming alone, or other activity that could be hazardous in the event of a seizure), and to follow up in two to three weeks (A.R. 423). There are no other treatment records from 2010.

By January of 2012, Plaintiff also had been diagnosed with fibromyalgia, major depression (recurrent), mood disorder and anxiety (A.R. 352-53). Plaintiff was taking, inter alia, Depakote, Effexor, Elavil (Amitriptyline) for sleep and fibromyalgia pain, Xanax as needed for anxiety, Lioresal for as needed muscle spasm and pain, and Norco, Vicodin and Ibuprofen as needed for pain (A.R. 353). In April of 2012, Plaintiff went to an emergency room complaining of a seizure (A.R. 378). Plaintiff reportedly had been off Depakote for the past two months because she could not afford it (A.R. 378). Plaintiff was prescribed Depakote and referred to her primary care physician for follow up (A.R. 374, 377).
///

The next available treatment records are from Dr. Mike's Walk In Clinic dated July of 2013 through March of 2014 (A.R. 386-405). At a physical examination on August 12, 2013, Plaintiff reported, <u>inter alia</u>, weight change, fatigue, weakness, double vision, shortness of breath, edema, palpitations, back pain, joint pain, headache, seizures, anxiety and depression (A.R. 397). On examination, Plaintiff reportedly had findings "WNL" (within normal limits), but for notations that she has dentures, reduced vision in her right eye "s/p MVC" (status post motor vehicle collision), right eye abnormalities (iris and size), hysterectomy scarring, anxiety and depression (A.R. 398-99). Plaintiff's medications (<u>i.e.</u>, Lipitor, Depakote, Xanax, Celexa, "HCTZ" (Hydrochlorothiazide), Trazodone, Amitriptyline and Tramadol) were refilled (A.R. 400).

Plaintiff returned on August 26, 2013 (A.R. 390). Blood and urine testing showed "out of range" (high) cholesterol, LDL cholesterol, AST, ALT, white blood cell count and hematocrit (A.R. 403-04). X-rays of Plaintiff's right shoulder and spine showed degenerative changes at the acromloclavicular joint and in the cervical and lumbar spine, and "mild degenerative change" in the thoracic spine (A.R. 405). Plaintiff was assessed with "CLBP" (chronic low back pain), "HTN" (hypertension), "HLD" (hyperlipidemia), seizures, anxiety and insomnia, and her medications were refilled (A.R. 390).

Plaintiff returned on September 6, 2013, complaining of pain in her right lower back, hip, and upper thigh during the previous five days (A.R. 391). On examination, she reportedly had right shoulder tenderness without edema and low back tenderness (A.R. 391). She was

assessed with back pain and right shoulder pain and referred to an orthopedist (A.R. 391).

Plaintiff returned on October 28, 2013, complaining of left side numbness from the cervical vertebrae down her arm and through her fingers (A.R. 392).[2] On examination, she reportedly had pain and stiffness in her left shoulder and spine (A.R. 392). She was assessed with mild degenerative joint disease at the C4-C5 level, muscle spasm and low back pain, prescribed Norco and Soma, and referred for physical therapy and pain management (A.R. 392). Plaintiff's prior referral to an orthopedist apparently was still "pending" (A.R. 392).

Plaintiff returned on November 15, 2013, complaining of a pinched nerve in the right side of her neck, which was tender on examination (A.R. 393). Plaintiff returned for medication refills in December of 2013, February of 2014, and March of 2014 (A.R. 387-88, 394). Blood test results were "in range" (A.R. 401-02). Plaintiff was assessed with spinal arthritis, anxiety, insomnia, hypertension, myopia and seizures, her medications were refilled, and she was referred for pain

---

[2]    On October 26, 2013, Plaintiff had gone to an emergency room complaining of left shoulder and arm pain (A.R. 363-64). On examination, Plaintiff reportedly had "TTP" (tenderness to palpation), reduced "ROM" (range of motion), and she was unable to move her arm secondary to pain (A.R. 363). X-rays of her shoulder and chest reportedly were normal, but a cervical spine x-ray showed "DJD" (degenerative joint disease) and spondylosis of the C4-C5 and C5-C6 vertebrae, left greater than right, and reversal of lordosis at C4, likely chronic (A.R. 363, 368-72). Plaintiff was diagnosed with cervical radiculopathy (A.R. 362). Plaintiff was given Norco and Toradol during her visit, prescribed Norco for home, and recommended to follow up with her primary care doctor for pain management (A.R. 363).

management, physical therapy, neurology and opthamology (A.R. 387-88, 394).

The next treatment records are from Dr. James Krider (A.R. 409-18). On March 13, 2014, Plaintiff presented for a refill of Xanax until she could see a psychiatrist (A.R. 409). Plaintiff complained of chronic neck pain (A.R. 409). Reportedly, there were no abnormal findings on examination (A.R. 410). Plaintiff was assessed with anxiety, depression (major, recurrent, mild), a mood disorder, elevated liver function tests, a history of tobacco use and a cervical disorder (A.R. 410). Dr. Krider refilled Plaintiff's Xanax and referred Plaintiff for behavioral health treatment (A.R. 410). Plaintiff returned on April 15, 2014, for follow up on blood testing, and Plaintiff sought medication because she reportedly was going through withdrawals from Xanax (A.R. 412). Again, there were no reported abnormal findings on examination (A.R. 412-13). Dr. Krider assessed drug withdrawal syndrome (Xanax) and noted: "already on multiple meds. Patient has a therapist. Trying to get into psych." (A.R. 413). There are no additional treatment records from Dr. Krider.

Plaintiff returned to Dr. Thakran for a neurology visit on April 21, 2014, stating that she had not followed up with Dr. Thakran since 2010 because she had no medical insurance (A.R. 434-36). Plaintiff also reported that Dr. Krider had taken her off Xanax (A.R. 434). Plaintiff complained of intermittent double vision (A.R. 434). On examination, Plaintiff reportedly had "pure motor right hemiparesis with ADM and EHL, strength 3/5, mute right toe," and no other reported

abnormal findings (A.R. 434-35).  Dr. Thakran assessed cerebrovascular disease, depression and post-traumatic epilepsy (A.R. 435).  Dr. Thakran prescribed Ecotrin, Klonopin, and Oxcarbazepine, continued Plaintiff's prescriptions for Hydrochlorothiazide, Celexa, Trazodone, Amitriptyline, Norco, and Protonix, and discontinued Plaintiff's nicotine patch and Tramadol (A.R. 435-36).  Dr. Thakran instructed Plaintiff to follow up with her psychiatrist to taper off some of the antidepressants (A.R. 435).

On May 5, 2014, Plaintiff presented for an initial psychiatric evaluation by Dr. Julie Wareham, complaining of difficulty functioning, difficulty concentrating, excessive worry and anxiety aggravated by CVA (A.R. 602).  Plaintiff sought a Klonopin refill (A.R. 602).  Dr. Wareham noted that Plaintiff had a history of changing doctors and changing medications (A.R. 602).  Plaintiff reportedly had doubled her Klonopin dosage on her own, and Plaintiff's primary care physician (Dr. Krider) reportedly "had detox[ed] her previously from Xanax and would not [prescribe] anymore [sic]" (A.R. 602).  Plaintiff reportedly was "not compliant" with her medication as prescribed and showed "minimal improvement" (A.R. 602).  On mental status examination, there reportedly were no abnormal findings apart from an anxious mood (A.R. 602-03).  Dr. Wareham assessed generalized anxiety disorder (symptomatic), and assigned a Global Assessment of Functioning ("GAF") score of 60 (A.R. 603).  See American Psychological Association, Diagnostic and Statistical Manual of Mental

///

///

///

Disorders ("DSM-IV-TR") 34 (4th Ed. 2000).[3]  Dr. Wareham refilled

Plaintiff's Celexa, Trazodone and Klonopin for one month only, and

ordered Plaintiff to coordinate care with her neurologist regarding

benzodiazepines (A.R. 603).


Plaintiff returned to Dr. Thakran on May 7, 2014, for a "24 hour

AEEG setup," reporting that she had fallen and hit her head several

days before (A.R. 432).  Plaintiff returned on June 12, 2014, for her

AEEG and MRI results, complaining of headaches (A.R. 429).  On

examination, there reportedly were no abnormal findings (A.R. 429-30).

Plaintiff's MRI was suggestive of right mesial temporal sclerosis and

her AEEG was normal.  See A.R. 430; see also A.R. 437-38 (brain MRI

report); A.R. 439 (EEG report).  Dr. Thakran continued Plaintiff's

Klonopin, Celexa, Trazodone, Oxcarbazepine, Ecotrin,

Hydrochlorothiazide, Norco and Protonix, discontinued Plaintiff's

Amitriptyline, and ordered Plaintiff to adhere to certain seizure

precautions (i.e., no driving, swimming alone, climbing, operating

machinery or engaging in any other hazardous activity) (A.R. 430).

Plaintiff returned on July 8, 2014, reporting that her right eye

drooped (A.R. 426).  Plaintiff said she had been to the emergency room

on July 6, 2014, for syncope (A.R. 426).  On examination, there were

no noted abnormal findings (A.R. 426).  Dr. Thakran increased

Plaintiff's Oxcarbazepine dosage and continued her other medications

///

---

[3]    A GAF of 51-60 indicates "[m]oderate symptoms (e.g.,
flat affect and circumstantial speech, occasional panic attacks)
or moderate difficulty in social, occupational, or school
functioning (e.g., temporarily falling behind in schoolwork)."
DSM-IV-TR, p. 34.

(A.R. 427). She instructed Plaintiff to follow up in four weeks (A.R. 427). There are no subsequent treatment records from Dr. Thakran.

Plaintiff began treatment with Dr. Richard Jones on August 18, 2014, reporting a history of fibromyalgia, cervical stenosis, anxiety, a seizure disorder, hypertension and CVA, and no "new" complaints (A.R. 565). Plaintiff reported that she was "in process for SSI disability" (A.R. 565). Plaintiff reportedly was taking Klonopin, Ecotrin, Hydrochlorothiazide, Norco, Oxcarbazepine and Trazodone (A.R. 566). Plaintiff apparently remarked that her health was "generally good," and denied fatigue, fevers and chills, weight change, headaches, loss of appetite, night sweats, sleep disturbance and pallor (A.R. 566). On examination, Plaintiff reportedly had no abnormal findings (A.R. 566). Dr. Jones diagnosed benign essential hypertension, generalized convulsive epilepsy, unspecified myalgia and myositis, cervical spine stenosis, anxiety, personal history of transient ischemic attack ("TIA") and cerebral infarction without residual deficits, and esophageal reflux (A.R. 567). Dr. Jones ordered blood and urine testing (A.R. 567; see also A.R. 563-64 (test results showing high HCT and high LDL cholesterol)).

Plaintiff began treatment with neurologist Dr. Veena Patel on September 2, 2014 (A.R. 456-61). Plaintiff initially complained of seizures, reporting that she had been experiencing seizures since her car accident in 1980, and that her seizures were frequent, moderate, uncontrolled and precipitated by heat and stress (A.R. 456). She also complained of headaches, saying that her headaches were frequent, moderate, and also uncontrolled (A.R. 456). On examination, there

reportedly were no abnormal findings (A.R. 457).  Dr. Patel diagnosed epilepsy and headache, ordered an EEG, and instructed Plaintiff to maintain a headache diary and a seizure diary, and to take seizure precautions (i.e., avoiding heights, pools, bath tubs, fires/stoves, etc.) (A.R. 457-58).  Plaintiff returned on September 24, 2014, for a follow up appointment (A.R. 459-61).  Again, Dr. Patel reported no abnormal findings on examination (A.R. 459-60).  Dr. Patel assessed epilepsy (uncontrolled), headache, grief and depression, prescribed Trazodone, instructed Plaintiff to return for follow up, and deferred a psychiatry consultation (A.R. 461).

Two days later, on September 26, 2014, Plaintiff presented to an emergency room complaining of a history of seizures, right side body stroke and depression (A.R. 465-68, 476-78).  Plaintiff reportedly woke up that morning with right side weakness, a droopy right eye, headache, decreased mental status (confusion and slowed speech), and trouble concentrating (A.R. 476-78).  Plaintiff reportedly was taking aspirin, Norco, Clonazepam (Klonopin), Hydrochlorothiazide and Oxcarbazepine (A.R. 477).  A CT scan of Plaintiff's head was normal (A.R. 465; see also A.R. 500-01 (CT scan report)).  An ultrasound of Plaintiff's carotid arteries was normal (A.R. 498 (ultrasound report)).  An ECG was also normal (A.R. 467; see also A.R. 497 (ECG report)).  A MRI did not show any acute intracranial process (A.R. 478).  Blood testing showed an elevated white blood cell count (A.R. 467; see also A.R. 481-96 (blood and urine test results)).  On examination, Plaintiff reportedly had right side weakness, a droopy right eyelid and decreased breath sounds in her lungs, but "equal grips and strength" and no other noted abnormal findings (A.R. 467,

476-79).  Plaintiff was assessed with cerebrovascular ischemia (or a "transient alteration in consciousness, improved"), epilepsy, right facial droop with cellulitis of the right upper eyelid, low blood pressure, speech disturbance (improved), and leukocytosis (A.R. 465, 477-79).  Plaintiff's dose of Trileptal was changed, and she advised to follow up with Dr. Patel (id.).

Plaintiff saw Dr. Jones on October 2, 2014,  reporting that she was very tired and recently had been admitted to the hospital for a stroke (A.R. 560).  On examination, Plaintiff had no reported abnormal findings (A.R. 561).  Dr. Jones diagnosed a "personal history of transient ischemic attack (TIA) and cerebral infarction without residual deficits," and benign essential hypertension, and ordered additional blood and urine testing (A.R. 562; see also A.R. 558-59 (testing showing high white blood cell count, HCT, neutrophils, cholesterol and LDL cholesterol)).

Plaintiff returned to Dr. Jones on November 12, 2014, requesting a CT scan of her right kidney (A.R. 550).  Dr. Jones reviewed a cervical spine MRI from October 28, 2014, showing degenerative changes and a 1.5 cm lesion in the left lobe of the thyroid gland.  See A.R. 550; see also A.R. 583-84 (cervical spine MRI report).  There were no abnormal findings reported on examination (A.R. 551-52).  Dr. Jones referred Plaintiff for "FNA" (fine needle aspiration) of the left lobe thyroid nodule and for a CT scan of the right kidney.  See A.R. 550, 552; see also A.R. 581-82 (November, 2014 abdomen CT scan report showing a 3-cm right kidney cyst); A.R. 588 (January, 2015 thyroid ultrasound report showing nodules); A.R. 589 (January, 2015

"uneventful" and "nondiagnostic" aspiration biopsy report); A.R. 570 (follow up visit for thyroid biopsy results diagnosing a left lobe thyroid nodule and recommending observation or surgery). Plaintiff also requested a prescription for Zoloft, reporting that she had an appointment scheduled with a psychiatrist (A.R. 550). Dr. Jones diagnosed an acquired cyst of the kidney, degeneration of the cervical intervertebral disc, nontoxic uninodular goiter, and major depressive disorder (recurrent, unspecified) (A.R. 552). Dr. Jones prescribed Zoloft, and directed Plaintiff to return in two months (A.R. 552). There are no other treatment notes from Dr. Jones.

On November 3, 2014, Plaintiff presented to an emergency room complaining of suicidal ideation and chronic back pain, and was put on a 72-hour psychiatric hold as a danger to herself (A.R. 525, 533-38). Plaintiff reported that her boyfriend had died recently (A.R. 533). Plaintiff's "ETOH" (blood alcohol) level reportedly was 0.23 percent, and she had a "borderline" ECG (A.R. 525, 530, 532). Plaintiff was diagnosed with suicidal ideation, alcohol abuse and chronic back pain, referred for outpatient treatment at Victor Valley Behavioral Health Clinic, and discharged with prescriptions for Carbamazepine, Methocarbamol (Robaxin), Sertraline (Zoloft) and Hydrocholorothiazide (A.R. 524, 526-27).

Plaintiff followed up for psychiatric treatment with Dr. Wareham on December 22, 2014, reporting that she had been put on a psychiatric hold in November of 2014 (A.R. 604). Plaintiff said she was on General Relief with no means of financial support, and had some medical problems including CVA, seizures, cysts on her kidney and

thyroid, and daily panic attacks and anxiety (A.R. 604). Dr. Wareham reported evidence of facial droop on the right side (A.R. 604). Dr. Wareham assessed generalized anxiety disorder (symptomatic), assigned a GAF of 60, discontinued Plaintiff's Zoloft, and prescribed Celexa, Klonopin and Trazodone (A.R. 604-05).

In a "Physician Initial Evaluation" form dated April 2, 2015, completed by a psychiatrist with Dr. Wareham's medical group, it is reported that Plaintiff had been out of her medication for one month, and complained of "severe" depressed mood, loss of interest/pleasure, change in appetite/weight, sleep disturbance, change in energy, guilt/worthlessness, poor concentration, crying spells and anxiety (A.R. 606). Plaintiff reportedly had a history of chemical abuse and dependence, drinking alcohol (vodka) for two years, with her last drink two years before (i.e., some time in 2013) (A.R. 607). On mental status examination, Plaintiff had a sad affect and depressed and anxious mood (A.R. 608). She was assessed with major depressive disorder and assigned a GAF of 65, with the highest GAF in the last year estimated at 80 (A.R. 608).[4] Plaintiff was prescribed Abilify, Effexor and Ambien (A.R. 608).

---

[4]     A GAF of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." See DSM-IV-TR, p. 34. A GAF of 71-80 indicates "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." Id.

Plaintiff returned to Dr. Patel for a neurological follow up on April 13, 2015, complaining of headache and memory loss (A.R. 634). Plaintiff reportedly had been off her seizure medication for one month, and had not followed up with Dr. Patel in the past due to stress in her personal life (A.R. 634). On examination, there were no reported abnormal findings (e.g., her memory was "normal, present and [o]verall intact[,] immediate, recent, and remote") (A.R. 635). Dr. Patel diagnosed epilepsy, headache, memory loss and ptosis of the eyelid (A.R. 636). Dr. Patel continued Plaintiff's Oxcarbazepine, ordered Plaintiff to maintain a seizure diary and to take seizure precautions (i.e., avoiding dangerous heights, swimming pools, bath tubs, fires/stoves, etc.), and directed Plaintiff to follow up in two weeks (A.R. 636). Plaintiff returned for follow up on May 26, 2015 (A.R. 637). EEG results reportedly were "abnormal." (A.R. 637). Dr. Patel noted no abnormal findings on examination, and diagnosed headaches, epilepsy, and sleep disturbance (A.R. 638). There are no additional treating notes from Dr. Patel.

Meanwhile, Plaintiff received regular pain management by providers at Global Pain Care from April of 2014 through May of 2015 (A.R. 504-22, 540-48, 621-32). When Plaintiff initially presented on April 8, 2014, she reported chronic radiating low back and neck pain for which she was taking Vicodin, Soma, Flexeril, Tramadol, Percocet, Ibuprofen and Neurontin (A.R. 504). Plaintiff said she had undergone physical therapy in May of 2009 with no relief, and had received trigger point injections in her shoulders which reportedly gave her "a lot of relief" (A.R. 504). On examination initially and throughout her pain management treatment, Plaintiff reportedly had tenderness in

her cervical and lumbar paraspinal muscles, tenderness in her cervical facet joints, increased pain with extension of the spine, Patrick's test causing pain in the low back on the right side, but good range of motion, 5/5 motor strength, and otherwise no abnormal findings. See A.R. 505-06 (findings on initial examination); A.R. 509, 512, 515, 518, 521, 541, 544, 547, 622, 625 (findings on subsequent examinations). A CT scan of Plaintiff's cervical spine showed multilevel degenerative spondylosis greater at C4-C5 and C5-C6 (A.R. 506). Plaintiff's provider assessed lumbar and cervical spondylosis, continued Plaintiff's Norco, discontinued Tramadol, and recommended a lumbar facet block (A.R. 506).

Plaintiff returned in May of 2014, reporting that a bilateral lumbar facet block done on April 30, 2014, did not provide much pain relief (A.R. 508). Plaintiff reported that her medications were helping (A.R. 508). Plaintiff's provider continued Plaintiff's Norco, discontinued Cyclobenzaprine and Lidocaine cream, and prescribed Ambien for insomnia (A.R. 509-10). In June and July of 2014, Plaintiff's Norco and Ambien were refilled (A.R. 511-13, 621-23). In August of 2014, Plaintiff's provider reviewed x-rays of the lumbar and cervical spine and recommended a lumbar and cervical spine MRI (A.R. 516; see also A.R. 596 (June, 2014 cervical spine x-ray showing reversal of the normal lordotic curve and degenerative changes with disc space narrowing and osteophyte formation at C3-C4 through C5-C6, bilateral C3-C4 and C4-C5 foraminal encroachment, and 1.4 mm posterior subluxation of C4 on C5); A.R. 597 (June, 2014 lumbar spine x-ray showing five degree dextroscoliosis, degenerative disc space narrowing and mild anterior osteophyte formation at L5-S1, and no significant

change since September, 2010 study)). Plaintiff's Norco and Ambien were refilled and she was prescribed Robaxin (A.R. 516). In September of 2014, Plaintiff's provider reviewed a MRI of Plaintiff's lumbar spine, which showed a disc protrusion at L3-L4, L4-L5 and L5-S1, neuroforaminal stenosis causing L5 or S1 nerve root impingement, and mild to moderate facet hypertrophy at L3-L4, L4-L5, and L5-S1 (A.R. 517-19; see also A.R. 598-600 (August, 2014 lumbar spine MRI report); A.R. 595 (September, 2014 lumbar spine x-ray showing evidence of discogenic disease at L5-S1)). In September and October of 2014, Plaintiff's provider continued Plaintiff's Norco, Robaxin and Ambien, and recommended a lumbar transforminal epidural steroid injection (A.R. 519, 522).

When Plaintiff returned in November of 2014, she reportedly had undergone a bilateral L3-L4 and L4-L5 epidural steroid injection on October 30, 2014, that allegedly provided relief for only a few hours after the procedure (A.R. 540). Plaintiff reported that her pain medications were helping (A.R. 540). Plaintiff's provider assessed lumbar and cervical spondylosis and myofascial pain syndrome, continued Norco and Ambien, decreased Robaxin due to nausea, and recommended trigger point injections at Plaintiff's next visit (A.R. 541-42). In December of 2014, Plaintiff had the first in a series of cervical, thoracic and lumbar spine trigger point injections, reporting significant improvement in her pain (A.R. 545). Plaintiff said she was not interested in any steroid injections (and the nurse practitioner concurred), and her medications were continued (A.R. 544-45). In January, February and March of 2015, Plaintiff's medications again were continued (A.R. 547-48, 626, 629). In May of 2015,

Plaintiff's medications were continued and she was recommended to have cervical trigger point injections at her next visit (A.R. 632). There are no subsequent pain management treatment notes in the record.

Plaintiff had a thyroidectomy in April of 2015 to remove a cancerous nodule (A.R. 610-14). Plaintiff followed up with an endocrinologist in May of 2015 (A.R. 616). Plaintiff reported difficulty swallowing, burning in her throat, and being extremely tired since her surgery (A.R. 616). A thyroid panel showed high TSH and low Thyroxine and free Thyroxine (A.R. 619).

On June 17, 2015, Dr. Victoria began treating Plaintiff monthly for her thyroid condition (A.R. 648).[5] Plaintiff complained of fatigue and chronic back pain which improves with Norco (A.R. 648). Plaintiff reportedly was taking Methocarbamol, Norco, Trazodone, Levothyroxine and Klonopin (A.R. 649). On examination initially and at subsequent visits, Dr. Victoria reported that Plaintiff had a palpable submandibular lymph node on her right side. See A.R. 649 (findings on initial examination); A.R. 650, 652, 654, 656, 658, 660-

///

///

_____

[5]     Defendant asserts that no treatment records are signed by Dr. Victoria, and that Plaintiff has presented no evidence that Dr. Victoria was one of her treatment providers. See Defendant's Motion, p. 4 n.2. Contrary to Defendant's assertions, the record indicates that Dr. Victoria was a treating physician, and his electronic signature appears on his treatment records. See, e.g., A.R. 649, 651, 653, 655, 657, 659, 661 (treatment notes electronically signed by Dr. Victoria); A.R. 643 (neurology consultation from August 4, 2015, listing Dr. Victoria as Plaintiff's referring physician).

61 (findings on subsequent examinations).[6] Dr. Victoria diagnosed
obesity, lumbar spine stenosis, hypothyroidism and cancer of the
thyroid gland (A.R. 649). Dr. Victoria referred Plaintiff for pain
management and cancer follow up, and ordered her to recheck her
thyroid hormones in eight weeks (A.R. 649).

In July of 2015, Plaintiff returned, reporting that she had been
taken off her thyroid medication for upcoming radiation therapy and
that she felt miserable and cold (A.R. 650). She reportedly was
taking Oxycodone, Effexor, Methocarbamol and Trazodone (A.R. 650).
Dr. Victoria continued Plaintiff's Oxycodone and discontinued her
Levothyroxine so that Plaintiff could undergo radiation therapy (A.R.
650-51).

In August of 2015, Plaintiff returned, reporting that she did not
want radiation therapy and wanted to be put back on her thyroid
medication (A.R. 652). Dr. Victoria referred Plaintiff for palliative

///
///
///
///
///
///
///

---

[6]     An June, 2016 ultrasound of Plaintiff's thyroid gland
showed a nonspecific borderline enlarged right submandibular
lymph node, and additional borderline enlarged left submandibular
lymph node with loss of fatty hilus (described as "suspicious")
(A.R. 699).

care for her lumbar spine stenosis, and noted that Plaintiff deferred radiation therapy and felt better on "nature thyroid" (A.R. 652-53).[7]

In September of 2015, Plaintiff returned, reporting that she "went to get radiation therapy" and was having neck pain (A.R. 654). However, Plaintiff again reportedly did not want radiation and wanted to be put back on "nature thyroid" (A.R. 654). Plaintiff reportedly was taking, <u>inter alia</u>, Norco, Trazodone, Xanax, Effexor and Methocarbamol (A.R. 654). Dr. Victoria continued Plaintiff's Norco, and noted that Plaintiff had stopped taking Synthroid and felt better on "nature thyroid" (A.R. 655).

In November of 2015, Plaintiff returned for follow up for radiation, reporting that she was tired and she did not think her Levothyroxine was working (A.R. 656). In addition to her prior medications, Plaintiff reportedly then was taking Abilify (A.R. 656). Dr. Victoria ordered Plaintiff's TSH level checked and suggested that Plaintiff continue her radiation therapy (A.R. 656-57).

///

---

[7]     Plaintiff presented to neurologist Dr. Shanker Dixit in August of 2015, reporting a history of CVA, approximately one year before, seizures, and having had a thyroidectomy for cancer (A.R. 643). Plaintiff complained of speech problems and right side weakness, blurry vision, double vision, chronic pain and anxiety (A.R. 643). On examination, Plaintiff reportedly had limited extraocular movements (<u>i.e.</u>, gaze restriction upwards in her left eye, partial third nerve palsy, and a lazy right eye), but otherwise no abnormal findings (A.R. 644). She was assessed with a history of CVA, generalized tonic-clonic seizure, fibromyalgia, history of head injury with lazy eye, and papillary carcinoma of the thyroid (A.R. 644). She was prescribed Gabapentin, and her Trileptal was discontinued (A.R. 644). An August, 2015 MRI of Plaintiff's brain was normal (A.R. 646).

In December of 2015, Plaintiff returned, reporting that she was anxious and "more depressed" due to her current condition, but that her pain was controlled (A.R. 658). Dr. Victoria diagnosed depression and continued Plaintiff's Abilify, Effexor, Xanax, Tramadol, Levothyroxine and radiation therapy (A.R. 658-59).

In February of 2016, Plaintiff returned, reporting "extreme debility," pain all over her body, a "worse" mood and feeling tired all the time (A.R. 660). She reportedly was taking Levothyroxine, Xanax, Norco, Lyrica, Tramadol, Cytomel, Trazodone, Abilify, Effexor and Methocarbamol (A.R. 660). There were no noted abnormalities on Plaintiff's "cognitive/functional" examination, and her physical examination was unchanged (A.R. 660-61). Dr. Victoria increased Plaintiff's Effexor dose (A.R. 661). There are no further treatment notes from Dr. Victoria.

The last medical record reflects treatment for thyroid cancer in June of 2016 by Dr. Anu Thummala (A.R. 696-97). Plaintiff complained of worsening fatigue, sleep disturbance and daytime somnolescence (A.R. 696). Plaintiff reportedly had undergone radioactive ablation in September of 2015 (A.R. 696). Dr. Thummala noted that there had been a "significant delay" in diagnosing and treating Plaintiff's cancer due to insurance reasons and Plaintiff's failure to stop taking Levothyroxine (A.R. 696). Plaintiff's physical examination reportedly was "unremarkable" (A.R. 697). Dr. Thummala ordered Plaintiff to continue Synthroid "suppression" and to return in four weeks (A.R. 697).

///

**II.  Summary of the Treating, Examining and Non-Examining Physicians'**
2     **Opinions**

3

4      Dr. Victoria's office submitted an undated "Physical Residual
5  Functional Capacity Statement" form that was transmitted on July 8,
6  2016 (A.R. 700-03; see A.R. 44 (ALJ noting evidence in the record as
7  of the June 17, 2016 hearing which did not include Dr. Victoria's form
8  at Exhibit 30-F)).  Dr. Victoria indicated Plaintiff had diagnoses of:
9  CVA, tonic-clonic seizure, fibromyalgia, papillary carcinoma of the
10 thyroid and a head injury with a "lazy eye" (A.R. 700).  Dr. Victoria
11 also indicated that Plaintiff had depression, anxiety and other
12 psychological factors affecting her physical condition (A.R. 700).
13 Dr. Victoria opined that Plaintiff had a "poor" prognosis (A.R. 700).
14 Dr. Victoria reported that Plaintiff had constant pain, dizziness and
15 extreme fatigue, and that her medications cause lethargy, fatigue,
16 nausea and an upset stomach (A.R. 700).

17

18      Dr. Victoria stated that Plaintiff: (1) had pain and stress
19 severe enough to interfere with the attention and concentration needed
20 to perform simple tasks "constantly"; (2) could not walk one city
21 block or on rough or uneven ground without rest or severe pain; (3)
22 could not "climb steps without the use of a handrail at a reasonable
23 pace"; (4) had problems balancing, stooping, crouching and bending;
24 (5) must lie down up to five hours in an eight-hour workday, for 30
25 minutes at one time, due to fatigue, pain and stress; (6) could sit
26 for 10 minutes at a time, stand for five minutes at a time, and walk
27 for five minutes at a time before needing to change positions; (7)
28 could sit for a total of approximately one hour in an eight-hour

workday; (8) could stand for a total of approximately one hour in an eight-hour workday; (9) would need to take unscheduled breaks every 15 minutes for 30 minutes at a time; (10) must elevate her feet while sitting for 60 percent of a workday; (11) must use a walker as needed;[8] (12) could lift and carry less than five pounds; (13) would have significant limitations reaching, handling or fingering; (14) could not push and pull arm or leg controls from a sitting position for six or more hours per day; (15) could not climb stairs, ladders, scaffolds, ropes or ramps; (16) had limited vision, memory lapses and needs to avoid temperature extremes; (17) would be off task more than 30 percent of a workday; (18) would miss work five or more days per month; and (19) would be unable to maintain work for eight hours a day, five days a week, due to her progressive health conditions and poor prognosis (A.R. 700-03).

Consultative examiner Dr. Earbin Stanciell reviewed medical records, examined Plaintiff and prepared a complete psychiatric evaluation dated September 15, 2014 (A.R. 450-53). Plaintiff complained of fears of death, multiple medical problems, depression, anxiety, feeling hopeless and worried, fears concerning her future, multiple stressors including her health and the recent death of her boyfriend from a heart attack one week earlier, insomnia, suicidal thoughts, difficulty eating and weight loss (A.R. 450, 452-53).[9]

---

[8]     Plaintiff reported that she did not use any assistive devices (A.R. 254).

[9]     Plaintiff's daughter agreed to take Plaintiff to an emergency room for evaluation of her suicidal status and possible inpatient psychiatric admission (A.R. 453).

24

Plaintiff was taking Klonopin, Trazodone, Celexa, Zolpidem, Methocarbamol, Norco, Hydrochlorothiazide, Oxcarbazepine and aspirin (A.R. 451). Plaintiff reportedly was seeing a therapist, and her primary care physician was prescribing psychiatric medications (A.R. 450). Plaintiff admitted a history of alcohol abuse but reportedly had not used alcohol in the past 2.5 years (A.R. 450). On mental status examination, Dr. Stanciell reported unremarkable findings apart from Plaintiff having a depressed and anxious mood, affect congruent with her mood, suicidal ideations with a strong urge to act on them, and an ability to remember only two out of three items after five minutes (A.R. 451-52). Dr. Stanciell diagnosed depressive disorder (not otherwise specified), and anxiety disorder (not otherwise specified), and assigned a GAF score of 45 with a "poor" prognosis (A.R. 452-53).[10] According to Dr. Stanciell, Plaintiff had "moderate difficulty" maintaining her composure and even temperament (A.R. 453).

Dr. Stanciell opined that Plaintiff has "mild" difficulties in maintaining social functioning, focusing and maintaining attention, and in concentration, persistence and pace, but she is intellectually and psychologically capable of performing the activities of daily living (A.R. 453). Dr. Stanciell opined that Plaintiff would have: (1) no limitations performing simple and repetitive tasks; (2) mild limitations performing detailed and complex tasks; (3) mild difficulties performing work activities on a consistent basis without

---

[10] A GAF score of 41-50 denotes "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR, p. 34.

special or additional supervision; (4) moderate limitations completing a normal workday or work week due to her mental condition; (5) mild limitations accepting instructions from supervisors and interacting with coworkers and with the public; and (6) moderate difficulties handling the usual stresses, changes and demands of gainful employment (A.R. 453).

State agency physicians reviewed the available medical records (which predated the diagnosis of Plaintiff's thyroid cancer and subsequent thyroidectomy as well as Dr. Victoria's treatment) and opined as of March, 2015 that Plaintiff is capable of performing light work with the limitations the ALJ adopted, and that Plaintiff's psychiatric impairment(s) are "non severe" (A.R. 77-94).[11] The state agency physicians gave "great weight" to Dr. Stanciell's opinion (A.R. 90).

## III. **Substantial Evidence Does Not Support the ALJ's Residual Functional Capacity Determination.**

The ALJ relied on the non-examining state agency physicians' opinions to conclude that Plaintiff retains a physical residual functional capacity for a reduced range of light work (A.R. 29). The record does not contain any opinion from a consultative examiner

---

[11] The Disability Determination Explanation on initial review is not included in the record. Instead, the record contains duplicate copies of the state agency physicians' Disability Determination Explanation on reconsideration. See A.R. 77-114. On initial review, state agency physician Dr. A. Lizarraras had opined that Plaintiff was not disabled. See A.R. 75-76 (Disability Determination and Transmittal forms).

concerning Plaintiff's physical limitations/abilities.  No treating or examining physician opined that Plaintiff retains a physical capacity to work.  To the contrary, as discussed herein, the only treating physician opinion is from Dr. Victoria, who found far greater limitations than the ALJ found to exist.  <u>See</u> A.R. 700-03.  The state agency physicians rendered opinions regarding Plaintiff's physical residual functional capacity as of March of 2015, on the basis of incomplete records that did not include Dr. Victoria's treatment records (which began in June of 2015) or Dr. Victoria's subsequent opinion.  <u>See</u> A.R. 78-83 (summary of medical records the state agency physicians reviewed).

The opinions of the non-examining state agency physicians, which contradict Dr. Victoria's opinion, cannot constitute substantial evidence to support the ALJ's decision.  "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician <u>or</u> a treating physician." <u>Lester v. Chater</u>, 81 F.3d 821, 831 (9th Cir. 1995) (emphasis in original); <u>see also</u> <u>Orn v. Astrue</u>, 495 F.3d 625, 632 (9th Cir. 2007) ("When [a nontreating] physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the [nontreating] physician are not 'substantial evidence.'"); <u>Pitzer v. Sullivan</u>, 908 F.2d 502, 506 n.4 (9th Cir. 1990) ("The nonexamining physicians' conclusion, with nothing more, does not constitute substantial evidence, particularly in view of the conflicting observations, opinions, and conclusions of an examining physician"); <u>compare</u> <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th

Cir. 2001 (opinion of non-examining medical source "may constitute substantial evidence when it is consistent with other independent evidence in the record").

Neither can the ALJ's lay interpretation of the medical records constitute substantial evidence to support the residual functional capacity determination. An ALJ cannot properly rely on the ALJ's own knowledge to make medical interpretations of examination results or to determine the severity of medically determinable impairments. See Tackett v. Apfel, 180 F.3d 1094, 1102-03 (9th Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998); Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975).

**IV.  Remand for Further Proceedings is Appropriate.**

The Court is unable to deem the error in the present case to have been harmless. See Treichler v. Commissioner, 775 F.3d 1090, 1105 (9th Cir. 2014) ("Where, as in this case, an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency"); see also Molina v. Astrue, 674 F.3d 1104, 1115 (9th Cir. 2012) (an error "is harmless where it is inconsequential to the ultimate non-disability determination") (citations and quotations omitted); McLeod v. Astrue, 640 F.3d 881, 887 (9th Cir. 2011) (error not harmless where "the reviewing court can determine from the 'circumstances of the case' that further administrative review is needed to determine whether there was prejudice from the error").

1   Remand is appropriate because the circumstances of this case
2   suggest that an expansion of the record and further administrative
3   review could remedy the error discussed herein.  <u>McLeod v. Astrue</u>, 640
4   F.3d at 888; <u>see also</u> <u>INS v. Ventura</u>, 537 U.S. 12, 16 (2002) (upon
5   reversal of an administrative determination, the proper course is
6   remand for additional agency investigation or explanation, except in
7   rare circumstances); <u>Dominguez v. Colvin</u>, 808 F.3d 403, 407 (9th Cir.
8   2015) ("Unless the district court concludes that further
9   administrative proceedings would serve no useful purpose, it may not
10  remand with a direction to provide benefits"); <u>Treichler v.</u>
11  <u>Commissioner</u>, 775 F.3d at 1101 n.5 (remand for further administrative
12  proceedings is the proper remedy "in all but the rarest cases");
13  <u>Harman v. Apfel</u>, 211 F.3d 1172, 1180-81 (9th Cir.), <u>cert. denied</u>, 531
14  U.S. 1038 (2000) (remand for further proceedings rather than for the
15  immediate payment of benefits is appropriate where there are
16  "sufficient unanswered questions in the record").  There remain
17  significant unanswered questions in the present record relating to
18  Plaintiff's residual functional capacity.

19
20                              **CONCLUSION**
21
22      For all of the foregoing reasons,[12] Plaintiff's and Defendant's
23  motions for summary judgment are denied and this matter is remanded

24
25          [12]    The Court has not reached any other issue raised by
26  Plaintiff except insofar as to determine that reversal with a
    directive for the immediate payment of benefits would not be
27  appropriate at this time.  "[E]valuation of the record as a whole
    creates serious doubt that [Plaintiff] is in fact disabled."
28  <u>Garrison v. Colvin</u>, 759 F.3d 995, 1021 (9th Cir. 2014).

for further administrative action consistent with this Opinion.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: June 26, 2018


                                    /s/
                         _____
                         CHARLES F. EICK
                         UNITED STATES MAGISTRATE JUDGE